897 A.2d 1140

WEST MORRIS PEDIATRICS, P.A., AND AVENEL–ISELIN MEDI-
CAL GROUP, P.A., INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, PLAINTIFFS, v. HENRY
SCHEIN, INC., DOING BUSINESS AS CALIGOR, DEFENDANT.

Superior Court of New Jersey
Law Division Morris County

Decided September 3, 2004.

582

Erie D. Katz and David Mazie, for plaintiff. (Nagel, Rice & Mazie, L.L.P., attorneys; Mr. Katz and Randee Matloff, on the brief.)

Steven P. Benenson and Linda Pissott Reig, for defendant. (Porzio, Bromberg & Newman, P.C., attorneys.)

Leon P. Gold and Karen E. Clarke, for defendant. (Proskauer Rose, L.L.P., attorneys.)

DUMONT, J.S.C.

## Introduction

This matter is a putative class action filed by two New Jersey medical practices individually and on behalf of a nationwide class of physicians, hospitals and other healthcare providers arising out of the purchase price of flu vaccine for the 2001–2002 flu season.[1] The plaintiffs, West Morris Pediatrics ("West Morris") and Avenel–Iselin Medical Group ("Avenel–Iselin"), allege they orally contracted with the defendant Henry Schein Inc., a medical supplies distributor doing business as "Caligor," to purchase the vaccine at a "guaranteed pre-booked price." (Clarke Aff. at Ex. 1, Second Am. Compl. ¶ 1.) They further contend Caligor did not honor the "guaranteed pre-booked price" when the vaccine became available for distribution in August of 2001. (Id.) Instead, Caligor advised the plaintiffs that the vaccine's price would be at least eighty percent higher than the pre-booked prices they were allegedly guaranteed. Due to the lack of any reasonably priced alternative at such a late juncture, the plaintiffs claim they were wrongfully

---

[1] Plaintiff West Morris Pediatrics commenced this action on February 4, 2002. The other named plaintiff, Avenel–Iselin Medical Group, joined the action after the lawsuit was announced in a February 7, 2002, article in The Star Ledger.

left with no choice but to purchase the vaccine at Caligor's increased price.

The Second Amended Complaint asserts the following theories of liability against Caligor: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the Consumer Fraud Act; (4) unjust enrichment; (5) conversion; and (6) promissory estoppel. (Clarke Aff. at Ex. 1, Second Am. Compl. ¶¶ 22–25.) On March 31, 2004, Caligor filed a Motion to Strike the Class Action Allegations. In response, the plaintiffs filed a Cross–Motion for Class Certification. For the reasons set forth below, the defendant's Motion to Strike the Class Action Allegations is granted and the plaintiffs' Cross–Motion for Class Certification is denied.

## I. FACTUAL BACKGROUND

The defendant Caligor is comprised of two separate divisions of the Medical Group of Henry Schein, Inc. (Clarke Aff. at Ex. 7, 1st Mlotek Cert. ¶¶ 2, 3; Moran Tr. 7:10–9:12.) The two separate divisions are known as Caligor Northeast and Caligor Regionals. Both divisions distribute, via their field sales representatives, a variety of healthcare products and equipment. Relevant here is the Caligor Northeast division, headquartered in Pelham Manor, New York and run by Vice President Arthur Moran ("Moran").[2] (*Ibid.*) As of early 2001, this division employed approximately fifty-four sales representatives who operated primarily in New York, Connecticut, New Jersey and Pennsylvania.

One of the healthcare products Caligor is in the business of distributing is flu vaccine. Because influenza strains change annually, a new vaccine is specially manufactured each spring after the particular strain of influenza is identified and approved by the Food and Drug Administration. (Clarke Aff. at Ex. 18.) Before the vaccine becomes available for distribution each sum-

---

[2] On June 20, 2003, the Court limited the scope of discovery to the Caligor Northeast division. Thus, it is the focus of the Court's inquiry.

mer, Caligor "pre-books" quantities of the vaccine with its customers in order to gauge customer interest and the amount of vaccine it needs to order from manufacturers. (*Id.* at ¶ 8; Moran Tr. 63:7–12, 73:12–17.) The company has been doing this since the mid–1980s. (Moran Tr. 61:8–13.) According to Caligor, pre-books are merely *reservations* for future orders. (*Id.;* Moran Tr. 60:18–61:7; Connett Tr. 24:24–25:10; Hoffman Tr. 52:5–53:15, 55:20–56:12.) (emphasis added.) When the vaccine actually becomes available for distribution and Caligor establishes its sales price, the customer can either (a) cancel its pre-book; or (b) convert it to a firm order.

Pre-booking for the 2001–2002 flu season began in November of 2000 and ran though the end of May 2001. During this time, Caligor Northeast's fifty-four sales representatives pre-booked 3,200 flu vaccine orders. (*Id.* at ¶ 9; Clarke Cert. at Ex. 8; Plotkin Tr. 18:9–19:15, 20:3–15.) (*Ibid.*) All 3,200 pre-books were entered into Caligor Northeast's computer system in Pelham Manor, New York. (Clarke Aff. at Ex. 7, 1st Mlotek Cert. ¶ 9.) As each pre-book was entered, the system automatically attached a fictitious price next to the entry. The price was "fictitious" because Caligor's computer system was actually designed for regular product orders, not pre-books, and thus always required information such as product price and shipping warehouse in order to complete an entry.[3] In late October of 2000, Moran set the fictitious pre-book price at $34.95 per vial of vaccine. As the months went by, however, this price was increased to account for the company's changing expectations about the market and revenue. (*Id.*) When the vaccine finally became available from manufacturers in August of 2001, the system's fictitious pre-book prices were replaced with Caligor's actual sales price of $64.95 per vial. Sales representatives then contacted their respective pre-booking

---

[3] Considering the problems giving rise to this lawsuit, Caligor would be wise to implement a computer system that does not require a price in order to complete a pre-book entry.

customers, advised them of the $64.95 price, and inquired as to whether each customer wished to place a firm order.

Because the flu vaccine distribution business has, in recent years, involved risks such as supply shortages, manufacturing delays, volatile prices and uncertainty about delivery time, Caligor has a company-wide policy of not making any promises to customers during pre-booking.[4] This policy is also in place because Caligor never knows what the vaccine's makeup and exact price will be until after the pre-booking period. (*Id.*) Moran reiterated the company's "no promises" policy several times a year to his Caligor Northeast sales force and always emphasized that the vaccine's price, brand, quantity and ship date would not be known until after the pre-booking period. Customers were never given copies of Caligor's computer records for their pre-books, and the company never issued uniform marketing statements, order forms or pre-booking confirmations containing pricing information.[5]

Despite Caligor's "no pre-booking promises" policy, several deviations occurred at the Caligor Northeast division which form the heart of this litigation. The nature and extent of those deviations are discussed below.

## A.  *The January 2001 Moran Memo*

On January 1, 2001, Moran sent the Caligor Northeast sales force a memo ("the January Memo") containing pricing information for the 2001–2002 flu vaccine. The prices ranged from $37.99 to $75.99, depending upon quantity and type ordered, and stated

---

[4] According to Caligor's counsel. flu vaccine sold from 1990 to 1996 had only seen price increases of approximately fifty cents to one dollar each year. In 2000 and 2001, however, the time period relevant to this lawsuit, many manufacturers had gone out of business, fewer companies were making it, and "somebody raised the price and others followed."

[5] The only reason Caligor produced computer printouts containing its pre-book information was because the plaintiffs requested this information for purposes of this lawsuit. The printouts were never maintained in Caligor's hard-copy records.

"THESE PRE BOOKED PRICES ARE ONLY GOOD UNTIL JUNE 22nd 2001." (*Id.*) According to Moran, the January Memo was a form document Caligor had used since 1992 that "should not have had prices on it." The document was essentially a standard letter used each year to: (a) announce the official commencement of the vaccine pre-booking period; (b) give the product code to be used when pre-booking the vaccine in the computer system; and (c) circulate lists of physicians who had previously purchased flu vaccine from Caligor sales representatives. Each year, Moran or his secretary would print up the prior year's form, make necessary changes and issue the updated memo with the attached physician lists. The majority of Caligor's sales representatives, including some who had been selling flu vaccine for thirty years, knew that any pricing information should be ignored and that the main purpose of the form letter was to advise them of the appropriate product codes for the new vaccine.

In contradiction to the January 2001 Memo, Moran sent two broadcast voice-mail messages to the Caligor Northeast sales force in early February 2001 emphasizing Caligor's "no pre-booking promises" policy. Namely, "[w]e don't have a brand [for the vaccine], we don't have a price, we don't have a return policy and we don't have a guarantee as to when your customers are going to receive this product." In addition to his broadcast messages, Moran issued another memo on February 14, 2001 ("the February Memo") reiterating the same policy: "we are not to quote ... pricing on any quantity of flu prebook orders." The February Memo also stated the following: "[p]lease note that our prebook Flu codes have been established since October. The pricing (cost and sell) associated with any of these codes are [sic] not valid and were [sic] only put there in order to allow us the ability to establish holding flu codes for our early prebook orders." According to Moran, the purpose of the February Memo was "to reinforce my verbal communication to the sales force."

Although the majority of the Caligor Northeast sales force followed the directives in Moran's voice-mail messages and February Memo, three of them did not. The sales practices of those three representatives are examined below.

### B. *Sales Representatives Michael Barto and Gerald Bender*

Michael Barto ("Barto") and Gerald Bender ("Bender") were among the eight Caligor Northeast sales representatives the plaintiffs chose to depose. Both men admitted to giving prices to some of their flu vaccine pre-book customers.

Barto acknowledged that out of his forty-nine pre-books, he orally gave prices to "less than a majority." Barto also admitted to giving a *written* price to Tri Valley Primary Care ("Tri Valley"), one of his forty-nine customers.[6] Barto was adamant however, that he advised his customers that prices were not "guaranteed" and were subject to change. According to Barto, the only reason he provided pre-book pricing information was "[t]o give the customer some type of a benchmark as to what the anticipated price may be."

Unlike Barto, Bender admitted that he gave "guaranteed" prices to between five and ten of his 135 pre-book customers. Plaintiff Avenel–Iselin claims it was one of these customers. In January 2001, Avenel–Iselin alleges Bender quoted it a price of $28.95 for 180 vials of flu vaccine, the same price it paid the prior year.[7,8] In providing guarantees like the one allegedly given to

---

[6] When Moran learned of the Barto Tri Valley incident, he took away the commission Barto earned on that sale. After the Schein Medical Group President, Michael Racioppi ("Racioppi"), learned of the same incident, he issued two memoranda to the entire sales force in September and October of 2001 asking if there were any other instances of pre-book customers being quoted prices. None were revealed.

[7] Interestingly, Caligor's computer records do not contain any pre-book information for Avenel–Iselin in January 2001. The only record of a pre-book is on May 15, 2001. In addition, Bender has no recollection of communicating a $28.50 price to Avenel–Iselin. Rather, he maintains that the only prices he gave customers were those in Moran's January Memo, $35.99 or $37.99. At this stage in the proceedings, however, the Court must accept as true Avenel–Iselin's allegations.

[8] Although Avenel–Iselin ultimately agreed in August of 2001 to accept delivery of its pre-booked quantity at Caligor's $64.95 price, it later cancelled a portion of its order and obtained it elsewhere.

Avenel–Iselin, Bender relied upon the pricing information in Moran's January Memo. However, after he received Moran's broadcast voice-mails and February Memo, he stopped quoting prices to his customers.

## C.  *Sales Representative Frank Stirrup*

Frank Stirrup ("Stirrup") came to Caligor Northeast in June of 2000 after spending the prior ten years in a similar sales capacity with a company known as Brunswick.  The defendant characterized him as a "short-lived" "rogue salesman." [9]   In November and December of 2000, he began pre-booking flu vaccine and quoting prices to customers.  Although he was not told to quote prices, Stirrup chose to do so after hearing from his regional manager, Tony Miller, that the price for flu vaccine would "probably" be around $34.99.[10]  Thereafter, Stirrup orally gave prices to his pre-book customers and also used two written methods to furnish pricing information:  (1) a self-created form letter and order form; and (2) Moran's January Memo.  The form letter and order form did not contain the words "guarantee" or "promise" and also indicated, "[o]ur pricing will be competitive based upon the volume you need."  In November of 2000, Stirrup quoted plaintiff West Morris a price of $34.95 for thirty vials of vaccine and confirmed the quote in writing via his self-created form letter and order form.[11]  The form letter contained the $34.95 price written in the blank space following the text of the letter.

---

[9] Stirrup resigned from Caligor in May of 2001.

[10] Evidently, Stirrup's previous employer pre-booked flu vaccine much later in the year than Caligor and thus was able to distribute price lists and quote customers the vaccine's exact purchase price.

[11] Notwithstanding this quote, West Morris agreed in August of 2001 to accept delivery of its pre-booked quantity at Caligor's $64.95 price.  (Clarke Aff. at Ex. 16.)

Stirrup continued his practice of quoting prices even after receiving Moran's broadcast voice-mails and February Memo advising the Caligor Northeast sales force not to quote prices. In particular, on February 23, 2001, he sent a letter to Montgomery Internal Medicine in Princeton, New Jersey, confirming a price quote of $49.99 and advising "[s]hould we experience a price increase your price of $49.99 will not change."

In total, Stirrup quoted prices of around $35.00 to approximately twenty-seven of his forty-six pre-booked customers. Twelve of the twenty-seven customers received Stirrup's self-created form letter and order form with varying prices written into the blank area of the form letter.

### D. *What Two Years of Discovery Have Revealed*

On June 20, 2003, the scope of discovery in this matter was narrowed to the Caligor Northeast division. The Court ordered that (a) Caligor did not have to disclose its nationwide customer lists for all customers who pre-booked 2001–2002 flu vaccine, but (b) Caligor did have to provide the plaintiffs with information concerning the 3200 customers who pre-booked flu vaccine with Caligor Northeast. As such, three customer complaints came to light regarding the $64.95 vaccine price Caligor ultimately charged.

One of the complaints was from Tri Valley, the pre-booked customer whom Barto gave a written price of $35.62. Caligor has since honored that price. The second complaint was from another of Barto's customers who claimed to have been promised a $49.00 price. When that customer refused to pay the $64.95 price, Caligor credited the customer with the difference. The third complaint was from Montgomery Internal Medicine, the customer to whom Stirrup had promised a $49.99 price in writing on February 23, 2001. That customer has since been issued a credit for the difference in price.

Other than the admissions by Bender, Barto, and Stirrup, all five of the other Caligor Northeast sales representatives the

plaintiffs chose to depose testified that they never quoted prices to any of their pre-booked customers. In fact, all five indicated that they did not recall receiving Moran's January Memo. Moreover, no other customer complaints have been revealed.

## II. DISCUSSION

The plaintiffs seek to represent a class consisting of "all physicians, hospitals and other healthcare providers throughout New Jersey and across the United States who contracted with Caligor to purchase flu vaccine at a guaranteed pre-booked price of less than $64.95 per vial ... and who were subsequently charged $64.95 per vial." At oral argument on August 6, 2004, plaintiffs' counsel, Mr. Katz, represented to the Court that the "class" the plaintiffs now endeavor to represent is limited to those customers who dealt with Caligor Northeast. The Court's analysis will be guided accordingly.

### A. *Standard of Review*

New Jersey's class action rule, R. 4:32, is modeled after Rule 23 of the Federal Rules of Civil Procedure. *Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 226, 294 *A.2d* 7 (1972). As such, New Jersey courts often look for guidance from federal cases interpreting Fed. R. Civ. P. 23. *Id.* at 226–27, 294 *A.2d* 7; *Carroll v. Cellco P'ship*, 313 *N.J.Super.* 488, 495–98, 713 *A.2d* 509 (App. Div.1998); *Fink v. Ricoh Corp.*, 365 *N.J.Super.* 520, 538, 839 *A.2d* 942 (Law Div.2000). It is a basic tenet of New Jersey law that "class actions are liberally construed, and such an action ... [should be] 'permitted unless there is a clear showing that it is inappropriate or improper.'" *Carroll, supra,* 313 *N.J.Super.* at 498, 713 *A.2d* 509 (*quoting Lusky v. Capasso Bros.*, 118 *N.J.Super.* 369, 373, 287 *A.2d* 736 (App.Div.1972), *certif, denied,* 60 *N.J.* 466, 291 *A.2d* 16 (1972)). This is especially true where there are allegations of consumer fraud. *In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 435, 461 *A.2d* 736 (1983); *Riley, supra,* 61 *N.J.* at 228, 294 *A.2d* 7 ("a court should be slow to hold that a suit

[alleging consumer fraud] may not proceed as a class action"); *Fink, supra,* 365 *N.J.Super.* at 536, 839 *A.2d* 942 ("[i]n consumer fraud cases the class action mode of adjudication is particularly appropriate"); *Delgozzo v. Kenny,* 266 *N.J.Super.* 169, 180, 628 *A.2d* 1080 (App.Div.1993).

■ To counterbalance the above tenet, the United States Supreme Court has cautioned that a class action should only be certified where the trial court has undertaken a "rigorous analysis" and is satisfied that the elements of Fed. R. Civ. P. 23(a), the equivalent of New Jersey's R. 4:32–1, have been met. *Carroll, supra,* 313 *N.J.Super.* at 495, 713 *A.2d* 509 (*quoting Gen. Tel. Co. v. Falcon,* 457 *U.S.* 147, 161, 102 *S.Ct.* 2364, 2372, 72 *L.Ed.2d* 740, 752 (1982)). This "rigorous analysis" does not involve a decision about the merits of the complaint because in deciding whether class certification is appropriate, "[t]he court is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack,* 524 *F.2d* 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 *U.S.* 816, 97 *S.Ct.* 57, 50 *L.Ed.2d* 75 (1976); *Olive v. Graceland Sales Corp.,* 61 *N.J.* 182, 189, 293 *A.2d* 658 (1972); *Delgozzo, supra,* 266 *N.J.Super.* at 180–81, 628 *A.2d* 1080. Nonetheless, the court's analysis must necessarily entail some examination of the claims, defenses, salient facts and substantive law so that it can "make a meaningful determination of the certification issues." *Castano v. Am. Tobacco Co.,* 84 *F.3d* 734, 744 (5th Cir.1996); *see also Maguire v. Sandy Mac, Inc.,* 138 *F.R.D.* 444, 447 (D.N.J. 1991), *vac'd on other grounds,* 145 *F.R.D.* 50 (D.N.J.1992) ("court must look beyond the bald allegations in the complaint to determine whether plaintiff has satisfied the requirements of Rule 23").

■ The party moving for class certification carries the burden of establishing all of the class action requirements. *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 *F.R.D.* 65, 72 (D.N.J.1993); *Fink, supra,* 365 *N.J.Super.,* at 567–68, 839 *A.2d* 942. In New Jersey, the movant must first demonstrate that the four threshold requirements of R. 4:32–1(a) are met. They are known as "numerosity, commonality, typicality, and adequacy of

representation." *In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 425, 461 *A.*2d 736 (1983). R. 4:32–1(a) details these requirements as follows:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Once the above elements are satisfied, the moving party must also demonstrate that the purported class action meets one of the three alternative requirements of R. 4:32–1(b). *Liberty, supra,* 149 *F.R.D.* at 73. Relevant to the Court's consideration here is the third alternative requirement set forth in R. 4:32–1(b)(3).[12] Specifically, the court must find "that the questions of law or fact in common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *R.* 4:32–1(b)(3). The requirements in this subsection are known as "predominance" and "superiority." *Saldana v. City of Camden,* 252 *N.J.Super.,* 188, 196, 599 *A.*2d 582 (App.Div.1991).

Each of the aforementioned requirements will be discussed below.

### B. *R. 4:32–1 Requirements*

#### 1. *Numerosity*

R. 4:32–1(a) requires the class to be "so numerous that joinder of all members is impracticable." *R.* 4:32–1(a). This numerosity requirement "is more than a mere 'numbers game.'" *Liberty, supra,* 149 *F.R.D.* at 74. Accordingly, the number of purported class members is not wholly dispositive of the analysis. *Id.* at 73. Additionally, the plaintiff does not have to show the exact size of the class in order to satisfy numerosity. *Ibid.*

---

[12] The Court reached this conclusion based on the fact that neither the defendant nor the plaintiff's assert that R. 4:32–1(b)(1) or (2) apply.

Rather, an equal part of the inquiry centers around whether "the difficulty and or inconvenience of joining all members of the class calls for class certification." *Lerch v. Citizens First Bancorp, Inc.,* 144 *F.R.D.* 247, 250 (D.N.J.1992).

■ In their Brief in Support of Class Certification the plaintiffs contend, "at a *minimum,* several hundred of Caligor's 3,200 customers in New Jersey and other states comprising Caligor's Northeast Region were quoted pre-book prices which the company did not honor." At oral argument, however, plaintiffs represented that the number of known, affected customers actually ranges from sixty to ninety-seven. The breakdown is as follows. First, when viewed liberally, Barto's admission that he gave prices to "less than a majority" of his forty-nine pre-books gives plaintiffs approximately twenty-five customers. Second, Bender admitted that he quoted prices to between five and ten pre-books. Again, allowing plaintiffs the benefit of all favorable inferences, this gives them another ten customers. Third, the plaintiffs gain an additional twenty-seven customers from Stirrup's deposition testimony. Therefore, the total is approximately sixty-two class members. In addition, the plaintiffs claim they now know of another thirty to thirty-five doctors who were affected by Caligor Northeast's conduct.

■ Notwithstanding the plaintiffs' allegations as to the number of affected customers, the evidence thus far suggests otherwise. As the case law emphasizes, the court cannot decide a class certification motion on the pleadings alone while turning a blind eye to facts procured through discovery. *Castano, supra,* 84 *F.*3d at 744; *Liberty, supra,* 149 *F.R.D.* at 73; *Maguire v. Sandy Mac, Inc.,* 138 *F.R.D.* 444, 447 (D.N.J.1991), *vac'd on other grounds,* 145 *F.R.D.* 50 (D.N.J.1992); *McClendon v. Cont'l Group, Inc.,* 113 *F.R.D.* 39, 44 (D.N.J.1986); *Glictronix Corp. v. Am. Tel. & Tel. Co.,* 603 *F.Supp.* 552, 584 (D.N.J.1984). According to the Second Amended Complaint, in moving for class certification, the named plaintiffs seek to represent those who "contracted with Caligor to purchase flu vaccine at a *guaranteed* pre-booked price of less than

$64.95 per vial" Out of the eight Caligor Northeast sales representatives the plaintiffs selected for deposition testimony, only two (Bender and Barto) admitted to giving customers pre-book prices of less than $64.95. Significantly, only *one* of the two, Bender, testified that he "guaranteed" such prices. Thus, per the allegations in the plaintiffs' own pleadings, Barto's twenty-five customers do not qualify as parties who were *"guaranteed* [a] pre-booked price of less than $64.95 per vial" In addition to Bender and Barto, Stirrup also admitted to quoting prices.[13] Whether or not Stirrup's twenty-seven price quotes were "guaranteed" is less clear from his testimony. Considering the evidence regarding Stirrup's policy of sending customers (1) the January 2001 Moran Mema and (2) his self-created form letter and order form with pricing information. the Court will assume for purposes of the numerosity analysis that all twenty-seven customers were "guaranteed" a pre-booked price. Besides the testimonial evidence from Bender, Barto and Stirrup, Caligor Northeast received a total of three complaints from its 3200 pre-book customers. Therefore, notwithstanding the plaintiffs' allegations, the evidence reveals that *at most,* forty customers were "guaranteed" prices (Bender's ten, Stirrup's twenty-seven and the three complaints).[14]

While the plaintiffs rely heavily on Caligor's computer records for the proposition that "several hundred more physicians were [very likely] given out prices" the Court does not find the computer records persuasive in that regard. Irrespective of the fact that Caligor Northeast sales representatives may have been entering different "fictitious" prices into the company's computer system,[15]

---

13 According to plaintiffs' counsel, Stirrup was the only former Caligor sales employee who would speak to Mr. Katz without counsel present. Thus, he was the only non-employee the plaintiffs were able to depose.

14 Since Caligor Northeast has reached agreements with the three complaining customers, they cannot be a part of this class action, and therefore will not be counted in the Court's numerosity analysis.

15 Apparently, Caligor Northeast sales representatives were not advised about the fact that throughout pre-booking, Moran periodically changed the comput-

there is neither evidence that these fictitious prices were ever communicated to customers, nor is there evidence that any customers were given copies of the computer records for their pre-books.[16] West Morris and Avenel–Iselin cannot and do not dispute this finding.

In *Fink, supra,* the trial court was confronted with the same issue of a disparity between the class action allegations and actual evidence. There, the named plaintiffs were purchasers of a digital camera who attempted to bring a class action against the camera's manufacturer under the New Jersey Consumer Fraud Act by claiming that the manufacturer had falsely advertised several of the camera's features. *Fink, supra,* 365 *N.J.Super.* at 531–33, 839 *A.2d* 942. The trial court denied class certification in part because it found numerosity lacking. *Id.* at 557–58, 839 *A.2d* 942. Although there were apparently 4450 customers who had purchased the digital camera, the plaintiffs could not point to any evidence that a single one of the 4450 purported class members bought the digital camera *because* they read or relied on the manufacturer's false advertisements. *Id.* at 555–58, 839 *A.2d* 942. In finding that the plaintiffs failed in their burden of showing numerosity, the court reasoned, "[h]ad a substantial number of purchasers of the RDC–1 camera come forward with complaints similar to those of plaintiffs, a finding of numerosity could have been readily made." *Id.* at 556, 839 *A.2d* 942.

Like the plaintiffs in *Fink,* West Morris and Avenel–Iselin have not shown the existence of a "numerous" group of customers who were allegedly affected *because* they pre-booked flu vaccine at a "guaranteed" price which was lower than $64.95. After more than two years of discovery and two published notices soliciting addi-

---

er's fictitious default price to account for the company's changing expectations about revenue. Thus, they often overrode prices that were greater than the $34.95 price that Moran had first established in late October of 2000.

[16] See footnote 5.

tional grievants,[17] the Court is essentially confronted with evidence that approximately thirty-seven customers were "guaranteed" prices less than $64.95 out of a total of 3200 customers who pre-booked 2001–2002 flu vaccine with Caligor Northeast. Such evidence does not support the plaintiffs' allegations that guaranteeing pre-book prices was a widespread practice. As was the case with the plaintiffs in *Fink,* West Morris and Avenel–Iselin are unable to point to evidence that a "substantial number" of the 3200 pre-booked customers "came forward with complaints similar to [theirs.]" *Ibid.* Although the plaintiffs argue that the *number* of complaints Caligor Northeast received is irrelevant, the Court concludes otherwise. As recognized by the court in *Fink.* the number of complaints acts as a gauge in determining the existence and scope of a problem. *Fink, supra,* 365 *N.J.Super.,* at 556, 839 *A.*2d 942. In the present case, the Court knows precisely how many people purchased 2001–2002 flu vaccine from Caligor Northeast. As such, the number of complaints the company received against those 3200 vaccine sales surely acts as a guidepost in determining the extent of the alleged pre-booking problem.

While the numerosity evidence the plaintiffs have produced thus far is certainly more than the plaintiffs in *Fink* were able to muster, it is wholly insufficient to establish a class "so numerous that joinder of all members is impracticable." *R.* 4:32–1(a). This is especially so where, as Caligor's counsel urged at oral argument, joinder of all thirty-seven customers is not "impracticable" because their identity is known, they are all in New Jersey and, thus, can be joined in one suit. *See, e.g., Liberty, supra,* 149 *F.R.D.* at 74 ("[p]racticability of joinder depends on a number of factors, including: the size of the class, case of identifying members and determining addresses, case of service upon members if joined. geographical dispersion and whether proposed members of the class would be able to pursue remedies on an individual

---

[17] In addition to the February 7, 2002 article in *The Star Ledger,* the plaintiffs placed an advertisement in a pediatric newsletter in September of 2002. Nonetheless, the advertisement procured no new grievants.

basis"); *Lerch, supra,* 144 *F.R.D.* at 250 ("[i]mpracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members of the class calls for class certification"). The plaintiffs have not even attempted to demonstrate that joining all thirty-seven customers is so difficult or inconvenient that class certification is warranted. As this showing is a necessary part of the numerosity requirement, the Court cannot disregard Caligor's point. Therefore, considering the lack of evidence of a class "so numerous that joinder of all members is impracticable." the Court finds that numerosity has not been met. *R.* 4:32–1(a).

### 2. *Commonality*

■ The commonality requirement dictates that there be "some question of fact or law common to the members of the class." *Liberty, supra,* 149 *F.R.D.* at 75. As a correlative to this, "[i]t is not necessary that *all* questions of fact or law raised be common." (emphasis added.) Indeed, "a single common question is sufficient." *Delgozzo, supra,* 266 *N.J.Super.* at 185, 628 *A.*2d 1080 (*quoting In re Asbestos School Litigation,* 104 *F.R.D.* 422, 429 (E.D.Pa.1984), *aff'd in part and vac'd in part sub nom.,* 789 *F.*2d 996 (3rd Cir.), *cert. denied,* 479 *U.S.* 852, 107 *S.Ct.* 182, 93 *L.Ed.*2d 117 (1986)). However, simply alleging the same theory of recovery for all class members does not guarantee the existence of legal or factual commonality. *Liberty, supra,* 149 *F.R.D.* at 75.

■ West Morris and Avenel–Iselin claim the commonality requirement in this case is easily "open and shut" in their favor. The Court disagrees. The Third Circuit's decision in *In re LifeUSA Holding, Inc.,* 242 *F.*3d 136 (3d Cir.2001) provides a helpful basis for this conclusion. There, the Third Circuit vacated the district court's order granting class certification based on its finding that the plaintiffs had not satisfied the commonality requirement of Fed. R. Civ. P. 23.[18] *Id.* at 147. The plaintiffs were

---

[18] The court also vacated the grant of class certification on the grounds that predominance and superiority laud not been satisfied. *In re LifeUSA Holding, Inc., supra,* 242 *F.*3d 136, 147.

purchasers of deferred annuity contracts who attempted to bring a class action against the seller, LifeUSA, on the grounds that it had fraudulently misrepresented the annuity's provisions and post-sale statements fraudulently misrepresented interest rates. *Id.* at 140. In reaching its decision that common questions did not exist, the court highlighted the fact that the plaintiffs' claims did not arise out of a single event or misrepresentation; rather, the claims arose out of 280,000 different purchaser's individual dealings with any one of the 30,271 LifeUSA agents. *Id.* at 145–46. Moreover, LifeUSA did not have any standard, scripted sales pitch for each of its agents to follow. *Id.* at 146. Consequently, each agent sold the annuities pursuant to his or her own sales technique and buyers did not receive identical information. *Ibid.* (noting how agents did not uniformly employ LifeUSA's marketing materials). As a result, the court found the record "uncompromising in revealing non-standardized and individualized sales 'pitches' presented by independent and different sales agents, all subject to varying defenses and differing state laws, thus making certification of individualized issues inappropriate." *Id.* at 147.

Here, there is the similar problem of the absence of a single event or misrepresentation, and the existence of an overwhelming amount of individualized factual and legal issues. In Paragraph 7 of the Second Amended Complaint, the plaintiffs characterize their proposed "Common Questions of Law or Fact" as follows:

a) Whether Caligor committed breach of contract when it charged plaintiffs a higher price for the flu vaccine than the guaranteed pre-booked price;

b) Whether the intentional conduct of Caligor in charging plaintiffs a higher price for the flu vaccine was done purposefully, intentionally or with reckless indifference to further defendant's own financial objective;

c) Whether Caligor converted money belonging to the plaintiffs and has thus been unjustly enriched by its demand and acceptance of the greater payment for the flu vaccine because the plaintiffs had no realistic alternative source from which to acquire the vaccine once they were advised of the increased price; and

d) Whether the conduct of Caligor was in violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1, *et seq.*, as it relates to a sub-class of New Jersey class members.

From the outset, it is clear that resolution of the above questions will require highly specific factual and legal determinations.

Akin to the situation in *In re LifeUSA,* answering Paragraph 7(a) *alone* requires investigation into the very content of *each individual* communication between Caligor Northeast's fifty-four sales representatives and the 3200 pre-booked customers to determine: (a) whether a "guaranteed" pre-book price was given; (b) whether a contract was formed; (c) the extent of the parties' prior and subsequent dealings; and (d) whether each customer has any records supporting Caligor's alleged guarantee. Moreover, all of Caligor Northeast's 3200 pre-books were oral and, like the sales agents in *In re LifeUSA,* not one of the 3200 conversations involved the use of a standard manual or scripted sales pitch. *In re LifeUSA, supra,* 242 *F.*3d at 146. It is therefore dubious that any of the 3200 pre-booking conversations were similar to others. Consequently, each of the conversations will likely be subject to "varying defenses" and individualized proofs at trial. *Ibid.*

Although West Morris and Avenel–Iselin urge that the commonality inquiry starts with the issue of "were you quoted a price at the time of pre-book," that is clearly not where the inquiry ends. The record at present is devoid of a uniform misrepresentation, omission or fraudulent practice common to all class members. Instead, it is replete with just the opposite. Simply because the plaintiffs have alleged the same legal theories for all class members does not change the fact that each theory is dependent upon categorically individualized factual scenarios. Moreover, the absence of any contractual documents supporting the plaintiffs' allegations of price guarantees only highlights the utter lack of commonality among the putative class members. Allowing this case to be certified as a class action under such circumstances is plainly not within the contemplation of R. 4:23–1(a)(2). *See, e.g., Liberty, supra,* 149 *F.R.D.* at 76 ("highly specific factual and legal determinations are not consistent with the commonality requirement of a class action and, indeed, undercut the purpose of the class action procedure"); *Saldana, supra,* 252 *N.J.Super.* at 197,

599 *A.*2d 582 ("commonality becomes obscured when the probable unique issues of liability, causation and damages in each case are considered, requiring individualized treatment at trial"). As Caligor rightly maintains, "[i]ndividual mini-trials would be necessary[.]" The Court cannot ignore that reality. As such, the plaintiffs have not satisfied their burden of showing "some question of fact or law common to the members of the class." [19] *Liberty, supra,* 149 *F.R.D.* at 75.

### 3. Typicality

Typicality requires that "the harm complained of be common to the class." *Hassine v. Jeffes,* 846 *F.*2d 169, 177 (3d Cir.1988). Where the legal or factual positions of the class representatives are "markedly different" from those of the putative class members, typicality will not be satisfied. *Zinberg v. Washington Bancorp, Inc.,* 138 *F.R.D.* 397, 406 (D.N.J.1990) (quoting *Weiss v. York Hosp.,* 745 *F.*2d 786, 810 n. 36 (3d Cir.1984), *cert. denied,* 470 *U.S.* 1060, 105 *S.Ct.* 1777, 84 *L.Ed.*2d 836 (1985)). In other words, "[i]f proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims." *Liberty, supra,* 149 *F.R.D.* at 77 (quoting *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 *F.R.D.* 54, 58 (S.D.Fla.1990)). Accordingly, in order to meet their burden, West Morris and Avenel–Iselin must demonstrate that their claims "have the essential characteristics common to the claims of the class." *In re Cadillac, supra,* 93 *N.J.* at 425, 461 *A.*2d 736 (quoting 3B *Moore's Federal Practice* ¶ 23.06–2 (1982)).

---

[19] Plaintiffs are correct in their assertion that it "makes no difference that 'the computation of damages among the members of the class would differ.'" (Quoting *Lusky v. Capasso Bros.,* 118 *N.J.Super.* 369, 373, 287 *A.*2d 736 (App.Div. 1972), *certif. denied,* 60 *N.J.* 466, 291 *A.*2d 16 (1972)). However, the Court's finding that the plaintiffs have not satisfied their burden of demonstrating commonality is not based on whether the putative class members would have different damage computations at trial.

■   The plaintiffs posit the "harm complained of" as follows: "Caligor quoted [guaranteed] pre-book prices [of less than $64.95] for flu vaccine in 2000 and 2001 and did not notify the class members until August 2001 that it would not honor the pre-book prices." The record reveals that this alleged "harm" is neither typical of the plaintiffs' claims, nor of the putative class members' claims. For instance, West–Morris' claim rests on the $34.95 price it was given in Stirrup's self-created order form. There is no evidence that this price was "guaranteed" or contracted for. In fact, the language in Stirrup's form letter indicates "[o]ur pricing *will be* competitive based on the volume you need" (emphasis added). Moreover, even if Stirrup's letter can be construed as a purported contract, West Morris did not make a payment at the time of pre-booking nor did it promise to take delivery and pay that price in the future. In addition, Avenel–Iselin's claim rests on a $28.50 price that is not supported by any record. Not only is its alleged January 2001 pre-book not reflected in Caligor's computer records, but the actual Avenel–Iselin pre-book that appears in Caligor's records in May 2001 occurred at a time when Bender testified he was no longer "guaranteeing" prices because he had received Moran's voicemails and February Memo.

There is similarly no evidence that all of the purported class members were quoted "guaranteed" pre-booked prices. In fact, the record shows that the majority of Caligor Northeast's 3200 customers were not even given any pre-book prices for the 2001–2002 flu vaccine. Thus, the harm of which plaintiffs complain is not only *uncommon* to the class, but proof of its occurrence as to West Morris and Avenel–Iselin will not necessarily prove all of the class members' varying complaints and experiences with any of the fifty-four different Caligor Northeast sales representatives. By way of example, individual questions of fact will undoubtedly have to be resolved as to each class member regarding: (a) whether they were "guaranteed" a price; (b) whether this price was contracted for: (c) whether the class member relied upon the "guaranteed" price; and (d) whether the class member suffered an ascertainable loss.

Accordingly, the named plaintiffs' claims do not have the "essential characteristics" common to the class because every putative member of this litigation, including the named plaintiffs, orally pre-booked flu vaccine on an individualized basis, thereby having "markedly different" experiences, understandings, and, necessarily, proofs at trial. *See, e.g., Morgan v. Markerdowne Corp.,* 201 *F.R.D.* 341, 349–50 (D.N.J.2001) (typicality requirement not met where many purported class members did not have the same experience as the class representative); *Fink, supra,* 365 *N.J.Super.* at 562–66, 839 *A.2d* 942 (typicality not satisfied where there existed numerous individual factual questions concerning reliance, proximate cause, ascertainable loss and conflicts of law analysis). As such, the plaintiffs' inability to speak with one voice as to how they and their putative class members were allegedly harmed falls well short of meeting the typicality requirement.

### 4. *Adequacy*

R. 4:32–1(a)(4) mandates that "the representative parties will fairly and adequately protect the interests of the class." As Caligor did not contest this requirement, the Court will not address it. Assuming the plaintiffs have met this requirement, other grounds plainly exist for denying class certification.

### 5. *Predominance*

The predominance requirement of R. 4:32–1(b)(3) "is more demanding than the commonality requirement." *Muise v. GPU, Inc.,* 371 *N.J.Super.* 13, 31, 851 *A.2d* 799 (App.Div.2004); *In re LifeUSA, supra,* 242 *F.3d* at 144. The plaintiff must demonstrate that "the issues common to the class outweigh those that are not." *Fink, supra,* 365 *N.J.Super.* at 568, 839 *A.2d* 942. Additionally, "[e]ven where the individual issues are fewer than common issues, it is the significance of the uncommon issues that sways the pendulum." *Ibid.* A court's predominance inquiry involves "an evaluation of the legal issues and the proof needed to establish them. As a matter of efficient judicial administration,

the goal is to save time and money for the parties and the public and to promote consistent decisions for people with similar claims." *In re Cadillac, supra,* 93 *N.J.* at 430, 461 *A.2d* 736 (citing FED. R. CIV. P, 23 Advisory Comm. Note, 39 *F.R.D.* 98, 102–03 (1966)).

As previously stated in the Court's discussion of the commonality requirement, the plaintiffs have asserted the same theories of recovery for themselves and their putative class members. Underlying each theory are numerous uncommon, individualized, factual and legal issues that operate to swing the pendulum in the defendant's favor.

■ For example, the plaintiffs' breach of contract claim involves an examination of each oral pre-book conversation and surrounding circumstances to determine: (1) whether a legally binding contract was formed; (2) what the material terms were and whether any of those terms were "guaranteed"; (3) whether the requisite consideration was given; and (4) whether the customer has any documentation to support the existence of a contract. As Caligor correctly points out, the issue of whether a legally binding contract was formed in each instance also raises a sub-issue about the dollar value of each alleged contract, since under the statute of frauds, oral contracts for the sale of goods in excess of $500.00 are unenforceable. *N.J.S.A.* § 12A:2–201(1).

The plaintiffs' promissory estoppel claim requires a showing of a clear and definite promise, made with the expectation that the promisee will rely thereon, and the promisee's reasonable reliance on the promise to their detriment. *Aircraft Inventory Corp. v. Falcon Jet Corp.,* 18 *F.Supp.*2d 409, 416 (D.N.J.1998). Like the breach of contract claim, this claim involves an examination of every pre-book conversation and surrounding circumstances to determine whether: (1) each relevant sales representative made a clear and definite promise; (2) the promise was made with the expectation that the pre-booking customer would rely thereon; (3) each customer in fact reasonably relied upon the promise; and (4) the customer suffered damages.

The Consumer Fraud Act claim requires the plaintiffs to demonstrate that Caligor Northeast engaged in "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression, or omission of any material fact with intent that others rely" upon it, and that the complainants have suffered an ascertainable loss as a result of the unlawful practice. *N.J.S.A.* §§ 56:8–2 to 56:8–19. Not unlike the other theories of liability, this claim involves numerous individualized determinations. Specifically, (1) whether any of the fifty-four Caligor Northeast sales representatives made false or misleading statements or omissions during each of the 3,200 pre-booking conversations; (2) what each sales representative's knowledge and intent was; and (3) whether any of the customers relied upon the false or misleading statements or omissions to their detriment.

West Morris and Avenel–Iselin have not attempted to argue that any of the above uncommon legal and factual issues are insignificant. Instead, they contend, "all factual issues as to the class are virtually identical in that all class members were quoted prices at pre-booking that were less than the ultimate price charged by Caligor at the time of delivery. Moreover, all the issues of law are common." This contention is not only erroneous, but it skirts around the very word upon which the plaintiffs' claims hinge: "guaranteed." West Morris and Avenel–Iselin brought this lawsuit based upon their claim that they orally contracted with Caligor to purchase flu vaccine at a "guaranteed" pre-booked price of less than $64.95 a vial. The Court cannot conceive of how the varied and individualized factual proofs needed to establish whether pre-booking prices were "guaranteed" to any of the class members during their respective oral pre-booking conversations, and, thus, whether Caligor is liable under the legal theories advanced by the plaintiffs, are "virtually identical" to all class members. Engaging in the inescapable "mini-trials" to determine the truth behind each customer's distinct experience with Caligor would in no uncertain terms hinder the goal of saving time and money for the parties and the public. *See Johnston v. HBO Film*

*Mgmt., Inc.,* 265 *F.*3d 178, 190 (3d Cir.2001) ("it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action"); *Szczubelek v. Cendant Mortg., Corp.,* 215 *F.R.D.* 107, 121–22 (D.N.J.2003); *Stephenson v. Bell Atlantic Corp.,* 177 *F.R.D.* 279, 291, 293 (D.N.J.1997).

Moreover, since the plaintiffs seek to certify a multi-state class of Caligor Northeast customers, variations in the laws of New York, Connecticut, New Jersey and Pennsylvania would only operate to complicate the already-existing burden of the multiplicity of individualized issues. As the law of the each customer's domicile would most likely govern their individual claim, the Court would have to keep track of any differences amongst the state laws and add them to the list of issues under consideration. *See, Fink, supra,* 365 *N.J.Super.,* at 568–70, 571–83, 585–86, 596–99, 839 *A.*2d 942 (differences in other states' consumer fraud schemes created numerous individual issues that defeated predominance); *Carroll, supra,* 313 *N.J.Super.* at 496, 713 *A.*2d 509 (*citing Castano, supra,* 84 *F.*3d at 744) ("in multistate class actions, variations in state law may overwhelm common issues and preclude a finding of predominance"); *Chin v. Chrysler Corp.,* 182 *F.R.D.* 448, 457, 460 (D.N.J.1998). The plaintiffs address this concern by urging that there are no material differences amongst the laws of the applicable states regarding breach of contract, unjust enrichment, conversion and promissory estoppel. While the Court largely agrees, that fact alone unfortunately will not swing the predominance pendulum in their favor. Simply put, there exist far too many uncommon issues of significant fact that need to be litigated on an individualized customer basis as opposed to a class-wide basis. Therefore, the plaintiffs cannot satisfy their burden of demonstrating predominance. *See In re LifeUSA, supra,* 242 *F.*3d at 147 ("[i]f commonality . . . does not exist, then common questions cannot predominate over individual issues because . . . each individual plaintiff's claim raises radically differing factual and legal issues from those of the other plaintiffs").

### 6. Superiority

The remaining question under R. 4:32–1(b)(3) is whether a class action is superior to other methods of adjudicating the controversy. In answering this query, a court is to be guided by the following three considerations: "(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method." *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A.*2d 736 (citing *Katz v. Carte Blanche Corp.,* 496 *F.*2d 747, 757 (3d Cir. 1974), *cert. denied,* 419 *U.S.* 885, 95 *S.Ct.* 152, 42 *L.Ed.*2d 125 (1974)).

Regarding the first consideration, an obvious alternative method of adjudication would be separate lawsuits. As previously discussed, if this case were to proceed as a class action, it would necessarily have to the conducted as a series of "mini-trials." Since that is the case, requiring aggrieved customers to proceed individually would not change the way their lawsuit was prosecuted. As to the second consideration, the plaintiffs raise the valid issue of the potential unfairness in forcing plaintiffs with small monetary damages and limited financial resources to individually try their cases. Nonetheless, "a class action should not be viewed only as a procedural device that assists plaintiffs with small claims to challenge a common adversary; it is also 'a means of providing a procedure that is fair to all parties and promotes judicial efficiency.'" *Carroll, supra,* 313 *N.J. Super.* at 509, 713 *A.*2d 509 (quoting *In re Cadillac, supra,* 93 *N.J.* at 435–36, 461 *A.*2d 736). Accordingly, in balancing fairness and efficiency (considerations two and three), "a class action must be *better than,* not merely as good as, other methods of adjudication." *Katz v. Carte Blanche Corp.,* 496 *F.*2d at 757 (emphasis added).

As is most likely clear from the Court's prior discussion, a class action would not be "better than" other methods of adjudication. It is not the potential size of the class that poses a genuine problem for the Court, but rather the difficulty in managing the

numerous individual "mini-trials" that are doubtless obligatory. Separate discovery will be required of each potential class member, individual credibility determinations will have to be made to establish which class members actually have valid claims, and the result will be "needlessly" protracted litigation. This certainly would not be as efficient or fair a method of trying this action as having each aggrieved customer proceed on an individual basis. In fact, a benefit of individual actions is the likelihood that the plaintiffs and putative class members would receive quicker results. Although some of the results might be *de minimus* or even nothing at all, that by itself is not a compelling reason for using the class action vehicle. In short, a class action would not be superior to other available methods of adjudicating the claims against Caligor.

### Conclusion

For the reasons set forth herein, the Court is not satisfied that the elements of R. 4:23–1 have been met. Accordingly, Caligor's Motion to Strike the Class Action Allegations is granted and West Morris and Avenel–Isein's Cross–Motion for Class Certification is denied.

So ordered.